J-S05010-16

2016 PA Super 47

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MATTHEW WOODRUFF, | |
| Appellant | No. 632 MDA 2015 |

Appeal from the Order Entered March 6, 2015
In the Court of Common Pleas of Lackawanna County
Criminal Division at No(s): CP-35-CR-0000872-2002

BEFORE:  BENDER, P.J.E., SHOGAN, J., and PLATT, J.[*]

OPINION BY BENDER, P.J.E.:                    **FILED FEBRUARY 23, 2016**

Appellant, Matthew Woodruff, appeals from the order denying his ex post facto challenge to the imposition of new sexual offender registration and reporting requirements under Pennsylvania's Sexual Offender Registration and Notification Act (SORNA), 42 Pa.C.S. § 9799.10–9799.41. After careful review, we affirm.

As a result of Appellant's 2002 conviction for indecent assault against a minor less than 13 years of age,[1,2] he was required to register with the

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 3126(a)(7).

[2] Appellant pled guilty on October 7, 2002.  On January 31, 2003, following a determination that he was not a sexually violent predator, Appellant was sentenced to a term of 6-18 months' incarceration.

Pennsylvania State Police (PSP) for a period of ten years under a prior version of Pennsylvania's Megan's Law[3] (Megan's Law II), 42 Pa.C.S. § 9791–9799.9 (expired December 20, 2012). **See** 42 Pa.C.S. § 9795.1(a)(1) (requiring a ten-year registration period for any person convicted of 18 Pa.C.S. § 3126 "where the offense is graded as a misdemeanor of the first degree or higher") (expired December 20, 2012). Additionally, under Megan's Law II, Appellant was required to report annually, in person, to the PSP. Following the end of his term of parole on September 14, 2004, Appellant began his ten-year registration period. Thus, Appellant's ten-year registration term was set to expire in September of 2014.

SORNA was enacted on December 20, 2011, and became effective on December 20, 2012. SORNA provides that:

> The following individuals shall register with the Pennsylvania State Police as provided in sections 9799.15 (relating to period of registration), 9799.19 (relating to initial registration) and 9799.25 (relating to verification by sexual offenders and Pennsylvania State Police) and otherwise comply with the provisions of this subchapter:
>
> ...
>
> (3) An individual who:
>
> (i) was required to register with the Pennsylvania State Police pursuant to this subchapter prior to December

---

[3] "Megan Kanka was a 7–year–old New Jersey girl who was sexually assaulted and murdered … by a neighbor who, unknown to the victim's family, had prior convictions for sex offenses against children. The crime gave impetus to laws for mandatory registration of sex offenders and corresponding community notification." **Smith v. Doe**, 538 U.S. 84, 89 (2003).

20, 2012, and who had not fulfilled the individual's
period of registration as of December 20, 2012; …

42 Pa.C.S. § 9799.13.

Because Appellant had not completed his registration requirements as of December 20, 2012, Section 9799.13(3)(i) applied to him. Under SORNA, Appellant's 2002 conviction is classified as a Tier III sexual offense. 42 Pa.C.S. § 9799.14(d)(8). Pursuant to this categorization, Appellant is now subject to, *inter alia*, lifetime registration requirements, 42 Pa.C.S. § 9799.15(a)(3), and quarterly reporting requirements, 42 Pa.C.S. § 9799.15(e)(3).

On November 25, 2014, Appellant filed in the trial court a "Petition to Reassess or Reclassify Period of Registration Under [SORNA]" ("the Petition"), in which Appellant advanced two arguments. First, he maintained that SORNA did not apply to him based upon calculating his ten-year registration term from the date of his conviction rather than from the date his parole expired. Second, Appellant argued that SORNA should not apply to him as it was violative of the ex post facto clauses of the United States and Pennsylvania Constitutions. The trial court held a hearing to consider the Petition on January 23, 2015. On March 6, 2015, the court entered an order denying the Petition, which is the subject of the instant appeal. The court contemporaneously filed a memorandum opinion setting forth its legal analysis in support of denying the Petition.

Appellant filed a timely notice of appeal on April 1, 2015 and, on May 20, 2015, he filed a timely, court-ordered Pa.R.A.P. 1925(b) statement.

That same day, the trial court issued an order indicating that it would not issue a Rule 1925(a) opinion, as the issues raised in Appellant's Rule 1925(b) statement had been addressed in the opinion accompanying the order denying relief. *See* Order, 5/20/15, at 2.

Appellant now presents the following question for our review:

Did [] the trial court err in failing to conclude that the effects of SORNA are sufficiently punitive to be in violation of the Ex Post Facto Clause of the United States and Pennsylvania Constitutions and, therefore, unconstitutional?

Appellant's Brief, at 3.

The Federal Constitution provides that: "No State shall … pass any … ex post facto Law…." U.S. Const. art. I, § 10, cl. 1. Similarly, the Pennsylvania Constitution provides that: "No ex post facto law … shall be passed." Pa. Const. art. I, § 17. Our Supreme Court has interpreted these ex post facto clauses to be effectively identical. *See Commonwealth v. Young*, 637 A.2d 1313, 1317 (Pa. 1993) ("As our interpretation of the state constitutional prohibition against ex post facto laws has been consistent with that of the United States Supreme Court's interpretation of the federal prohibition, the analysis of [the] appellant's federal ex post facto claim disposes of his state claim as well."). Moreover, although Appellant ostensibly raises an ex post facto challenge to SORNA under both the United States and Pennsylvania Constitutions, he does not present distinct arguments for each claim. Accordingly, as our Supreme Court did in *Young*,

we consider Appellant's ex post facto challenge to SORNA using federal ex post facto standards.

The United States Supreme Court first defined what is meant by "ex post facto laws" in 1798, when Chief Justice Chase explained that such laws fall into one or more of the following four categories:

> 1st.  Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action.  2nd.  Every law that aggravates a crime, or makes it greater than it was, when committed.  3rd.  Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.  4th.  Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Calder v. Bull*, 3 U.S. 386, 390 (1798).

Thus, it is clear from the very first interpretation of the Federal Constitution's ban on ex post facto laws that the prohibition pertains to retroactive criminal punishments, and not to retroactive civil restraints or penalties.  It is not in dispute that the new constraints imposed on Appellant by SORNA are retroactive; the statute itself dictates their retroactive application.  *See* 42 Pa.C.S. § 9799.13.  Thus, dispositive of whether these restraints are prohibited as ex post facto laws is whether these restraints are punitive in intent, or in effect.  *See Smith*, 538 U.S. at 92.

In *Smith*, the United States Supreme Court delineated the framework for this inquiry as follows:

> We must "ascertain whether the legislature meant the statute to establish 'civil' proceedings."  *Kansas v. Hendricks*, 521 U.S.

346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and non[-]punitive, we must further examine whether the statutory scheme is "'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'" *Ibid.* (quoting *United States v. Ward*, 448 U.S. 242, 248–249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). Because we "ordinarily defer to the legislature's stated intent," *Hendricks*, *supra*, at 361, 117 S.Ct. 2072, "'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty," *Hudson v. United States*, 522 U.S. 93, 100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (quoting *Ward*, *supra*, at 249, 100 S.Ct. 2636); *see also Hendricks*, *supra*, at 361, 117 S.Ct. 2072; *United States v. Ursery*, 518 U.S. 267, 290, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996); *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 365, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984).

*Id.*

Appellant's statement of the question involved appears to sidestep the intent inquiry, as he asks this Court to consider whether the "*effects* of SORNA are sufficiently punitive." Appellant's Brief, at 3 (emphasis added). He also acknowledges that "the Legislature in both Megan's Law and SORNA has expressed it[s] [] intent that the enactment of both were non-punitive." *Id.* at 11. Indeed, the Legislature "stated in its policy declarations that the provisions of SORNA were not criminal." *Commonwealth v. Perez*, 97 A.3d 747, 751 (Pa. Super. 2014), *reargument denied*, (Pa. Super. 2014) (citing 42 Pa.C.S. § 9799.11(b)).

Nevertheless, in the argument section of his brief, Appellant asserts two reasons why we should not take the Legislature's declaration of non-punitive intent at face value in analyzing the first prong of the *Smith* test.

- 6 -

First, Appellant argues that, despite dramatically increasing Appellant's registration and reporting requirements under SORNA, the Legislature "has not changed the grading of the predicate offense." Appellant's Brief, at 12. Second, Appellant points to the fact that SORNA "is set within the Pennsylvania criminal sentencing framework where punishment for criminal convictions is procedurally determined." *Id.* at 13.

Appellant's first intent-related argument is no more than an assertion that SORNA is punitive *in effect*. Accordingly, that assertion is more appropriately addressed under the second prong of the **Smith** test. Appellant's second intent-related argument appears to somewhat mirror concerns raised in the concurring opinion in **Perez**. **See Perez**, 97 A.3d at 762 (Donahue, J. concurring) (hesitating to "conclude that the first prong of the **Smith** test is satisfied without further inquiry," given that the manner of codification is probative of legislative intent, and "[u]nlike the Alaska statute at issue in **Smith**, all of SORNA's notification, registration, and procedural provisions are codified in one section of the State's 'Judiciary and Judicial Procedure Code,' specifically under Chapter 97, titled 'Sentencing'"). However, Appellant provides minimal discussion, and no supporting case law, addressing his challenge under **Smith**'s first prong. Accordingly, we conclude that this aspect of his ex post facto challenge has been waived due

to his failure to present the issue in a manner permitting meaningful appellate review.[4]

Thus, we next consider Appellant's arguments regarding the second prong of the **Smith** test.

> This second prong enlists seven factors the Supreme Court has found to be "useful guideposts" for determining whether a statute unconstitutionally imposes retroactive punishment. [**Smith**, 538 U.S. at 97]; **see Kennedy v. Mendoza–Martinez**, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). The "**Mendoza–Martinez**" factors are: 1) whether the sanction involves an affirmative disability or restraint; 2) whether it has historically been regarded as a punishment; 3) whether it comes into play only on a finding of scienter; 4) whether its operation will promote the traditional aims of punishment—retribution and deterrence; 5) whether the behavior to which it applies is already a crime; 6) whether the alternative purpose to which it may rationally be connected is assignable for it; and 7) whether

---

[4] As this Court stated in **Commonwealth v. Hardy**, 918 A.2d 766 (Pa. Super. 2007):

> When briefing the various issues that have been preserved, it is an appellant's duty to present arguments that are sufficiently developed for our review. **Commonwealth v. Gould**, 912 A.2d 869, 873 (Pa. Super. 2006). The brief must support the claims with pertinent discussion, with references to the record and with citations to legal authorities. **Id.**; Pa.R.A.P. 2119(a), (b), (c). Citations to authorities must articulate the principles for which they are cited. Pa.R.A.P. 2119(b).
>
> This Court will not act as counsel and will not develop arguments on behalf of an appellant. **Gould**, 912 A.2d at 873. Moreover, when defects in a brief impede our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived. **Id.**; Pa.R.A.P. 2101.

**Id.** at 771.

it appears excessive in relation to the alternative purpose assigned. *Id.*, at 168–69, 83 S.Ct. 554.

*Lehman v. Pennsylvania State Police*, 839 A.2d 265, 271 (Pa. 2003).

"The *Mendoza–Martinez* factors are 'neither exhaustive nor dispositive,' *Smith v. Doe*, at 1149, but they 'must be considered in relation to the statute on its face, and only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.'" *Lehman*, 839 A.2d at 271-72 (quoting *Hudson v. United States*, 522 U.S. 93, 100 (1997)).

Initially, we note that sex offender notification and reporting requirement statutes, *i.e.*, Megan's Law statutes, have generally survived scrutiny under ex post facto analysis. For instance, the *Smith* court ultimately concluded that the Alaska Sex Offender Registration Act (ASORA), Alaska's version of Megan's Law, was not violative of the prohibition against ex post facto laws. ASORA included, *inter alia*, lifetime registration requirements for sex offenders who had been convicted of "an aggravated sex offense or of two or more sex offenses[,]" *Smith*, 538 U.S. at 84 (syllabus). However, although ASORA required some registrants to update the sex offender registry quarterly, "on its face, [the statute did] not require these updates to be made in person." *Id.* at 101. Thus, the mandatory, quarterly, in-person reporting requirements imposed under SORNA differ from ASORA in this regard. In any event, the *Smith* Court concluded, after analyzing each of the *Mendoza–Martinez* factors, "that respondents cannot show, much less by the clearest proof, that the effects of the law negate

Alaska's intention to establish a civil regulatory scheme." ***Smith***, 538 U.S. at 105.

In ***Commonwealth v. Gaffney***, 733 A.2d 616 (Pa. 1999), our Supreme Court addressed provisions of Megan's Law I which imposed ten-year registration requirements, annual verification, and immediate notification of address changes for convicted sex offenders. ***Id.*** at 617. The Supreme Court concluded that those aspects of Megan's Law I were non-punitive and, therefore, that the statute did not constitute an ex post facto law.[5] ***Id.*** at 621.

In ***Commonwealth v. Williams***, 832 A.2d 962, 975 (Pa. 2003) (***Williams II***),[6] our Supreme Court considered whether the provisions of Megan's Law II were punitive in effect using the ***Mendoza–Martinez*** factors. Specifically, the ***Williams II*** Court considered whether the Megan's Law II's registration, notification, and counseling requirements, applicable to

---

[5] The ***Gaffney*** Court did not apply the ***Mendoza–Martinez*** factors. Instead, that court analyzed the ex post facto challenge to Megan's Law I at issue in that case under then-applicable, Third Circuit precedent from ***Artway v. Attorney General***, 81 F.3d 1235 (3d Cir. 1996), and ***E.B v. Verniero***, 119 F.3d 1077 (3d Cir. 1997). In ***Lehman***, our Supreme Court abandoned that precedent in favor of utilizing the ***Mendoza–Martinez*** factors, as the United States Supreme Court had done in ***Smith***.

[6] This nomenclature is consistent with prior decisions of this Court and our Supreme Court. "***Williams I***" refers to ***Commonwealth v. Williams***, 733 A.2d 593 (Pa. 1999) (finding unconstitutional Megan's Law I's imposition of a greater maximum term of confinement for sex offenders deemed sexually violent predators (SVP), where the burden was on the defendant to prove he was not an SVP).

individuals deemed sexually violent predators (SVPs), were punitive, and concluded that they were not. *Id.* at 986 ("Megan's Law[ II]'s registration, notification, and counseling provisions constitute non-punitive, regulatory measures supporting a legitimate governmental purpose. Therefore, these measures are presently upheld against [the a]ppellees' claim that they result in additional criminal punishment."). Notably, with respect to the ostensibly onerous *monthly* counseling requirements at issue in that case,[7] the Court held that they: did not constitute an affirmative disability or restraint, *id.* at 974; did not "implicate traditional methods of punishment," *id.* at 977; served an explicitly non-punitive purpose, *id.* at 979-80, and were not excessive with respect to the fulfillment of the legitimate, non-punitive purposes of the statute, *id.* at 981.

This is not the first instance in which SORNA has been addressed in the context of an ex post facto challenge. A similar claim was raised in *Perez*, where the appellant challenged the retroactive application of the 25-year registration period imposed for Tier II offenses pursuant to 42 Pa.C.S. § 9799.15(a)(2), due to his conviction for indecent assault. *Perez*, 97 A.3d at 749-50. At the time he committed the indecent assault (specifically, 18

---

[7] The **Williams II** Court described the counseling requirements as follows: "The Act also requires a sexually violent predator to attend 'at least monthly' counseling sessions in a program approved by the Board, and to pay all fees assessed from such sessions, unless he cannot afford them, in which case they are paid by the parole office." *Id.* at 968.

Pa.C.S. § 3126(a)(6)), the then-applicable Megan's Law registration period was only ten years for that offense. Thus, the appellant claimed the imposition of the 25-year registration period constituted an unconstitutional ex post facto law.

Although the **Perez** Court found that its analysis of the 25-year registration period under the first **Mendoza–Martinez** factor weighed in favor of finding SORNA to be punitive in effect, the Court determined that the remaining six factors weighed against finding SORNA to be punitive in effect, or that they were of little weight. As such, the **Perez** Court concluded that Perez had not "shown by the 'clearest proof' that the effects of SORNA are sufficiently punitive to overcome the General Assembly's preferred categorization." **Perez**, 97 A.3d at 759.

This Court has also rejected claims that SORNA's 15-year registration requirement was effectively punitive. **See Commonwealth v. Giannantonio**, 114 A.3d 429, 437 (Pa. Super. 2015) (applying **Perez**); **see also Commonwealth v. McDonough**, 96 A.3d 1067, 1069 (Pa. Super. 2014), *appeal denied*, 108 A.3d 34 (Pa. 2015) (holding SORNA's 15-year registration requirement to be non-punitive for purposes of whether it constitutes unconstitutionally excessive punishment). However, no Pennsylvania court has yet addressed whether SORNA's lifetime registration and quarterly, in-person reporting requirements are effectively punitive for ex post facto purposes. Accordingly, we shall now consider whether Appellant has demonstrated by the clearest proof, with respect to the

- 12 -

*Mendoza–Martinez* factors, that SORNA's lifetime registration and quarterly, in-person reporting requirements are effectively punitive.

*1) whether the sanction involves an affirmative disability or restraint*

In **Williams II**, our Supreme Court held that the lifetime registration requirements imposed on SVPs pursuant to Megan's Law II, *inter alia*, did not impose an affirmative disability or restraint because lifetime registrants "remain free to live where they choose, come and go as they please, and seek whatever employment they may desire." **Williams II**, 832 A.2d at 973 (internal quotation marks and citations omitted). Additionally, the **Williams II** Court found that the "monthly counseling sessions" required of lifetime registrants could not "be compared to incarceration or deprivation of citizenship, or even to the liberty-restricting conditions of probation." **Id.** at 974.

Here, we ascertain no significant difference between the instant case and **Williams II** with respect to the first **Mendoza–Martinez** factor in regard to the lifetime registration requirements at issue. Additionally, Appellant's quarterly, in-person reporting requirements appear comparable to the mandatory, monthly counseling sessions at issue in **Williams II**. If anything, the frequency and potential intrusiveness of the monthly counseling requirement for SVPs under Megan's Law II appear more onerous than SORNA's quarterly, in-person reporting requirement.

Nevertheless, Appellant requests that we apply the conclusion reached by the **Perez** Court that SORNA's semi-annual reporting requirement, over the course of a 25-year registration term, constitutes "an affirmative constraint on Appellant's conduct imposed directly by SORNA" that "weighs in favor of finding SORNA punitive." **Perez**, 97 A.3d at 754. Clearly, Appellant's lifetime, quarterly, in-person reporting requirements are more onerous than those involved in **Perez**.

Despite this apparent conflict in reasoning between **Perez** and **Williams II**, and out of an abundance of caution,[8] we acquiesce to Appellant's request to apply **Perez**'s analysis with regard to the first **Mendoza–Martinez** factor weighing in favor of finding SORNA's effects to be punitive. Appellant is currently 34 years old. The average lifespan of an American male is approximately 79 years. Thus, it would be fair to estimate that Appellant will be required to report to authorities approximately 180 times during his life, regardless of whether he changes his address, employment, or any other circumstance relevant to monitoring registrants under SORNA during that time, all of which Appellant would be required to report independent of his quarterly reporting requirement. Therefore, while we do not believe SORNA's lifetime registration requirement imposes an

---

[8] The **Perez** decision may, in fact, be binding precedent on this panel. Although addressing different registration and reporting requirements, the registration and reporting requirements at issue here are clearly more burdensome.

affirmative disability or restraint by itself, we hold, pursuant to **Perez**, that the quarterly, in-person reporting requirement does. Accordingly, we find that the first **Mendoza–Martinez** factor weighs in favor of finding SORNA's effects to be punitive as applied to Appellant.

*2) whether it has historically been regarded as a punishment*

Next, we consider whether Appellant's lifetime registration and quarterly, in-person reporting requirements are historically regarded as punishment. Appellant contends that they are, given the similarities between these requirements and the constraints imposed on probationers.

In **Smith**, the United States Supreme Court rejected a lower court's similar conclusion:

> The Court of Appeals held that the registration system is parallel to probation or supervised release in terms of the restraint imposed. This argument has some force, but, after due consideration, we reject it. Probation and supervised release entail a series of mandatory conditions and allow the supervising officer to seek the revocation of probation or release in case of infraction. By contrast, offenders subject to the Alaska statute are free to move where they wish and to live and work as other citizens, with no supervision. Although registrants must inform the authorities after they change their facial features (such as growing a beard), borrow a car, or seek psychiatric treatment, they are not required to seek permission to do so. A sex offender who fails to comply with the reporting requirement may be subjected to a criminal prosecution for that failure, but any prosecution is a proceeding separate from the individual's original offense.

**Smith**, 538 U.S. at 101-02 (internal citations omitted). Notably, in **Smith**, while considering the second **Mendoza–Martinez** factor, the United States

Supreme Court rejected a factual conclusion made by the Court of Appeals "that the offender had to update the registry in person," noting that "the record contains no indication that an in-person appearance requirement has been imposed on any sex offender subject to the Act." *Id.* at 101. Here, however, Appellant is required to report in-person. Thus, in this sense, at least, the analogy between SORNA's registration and reporting requirements, and the traditional criminal sanction of probation, appears to be stronger than the requirements analyzed in *Smith*.

Appellant suggests we follow the reasoning of the Commonwealth Court's recent analysis of SORNA under the second *Mendoza–Martinez* factor. Therein, the Commonwealth Court stated:

> The requirement that Coppolino appear in person quarterly to verify his information might be seen as analogous to the requirements that a probationer or parolee regularly contact his probation or parole officer and supply him with information. For instance, akin to the quarterly verification required by Section 9799.15(e)(3), the regulations of the Pennsylvania Board of Probation and Parole (Parole Board) require that a parolee "[m]aintain regular contact with the parole supervision staff by ... [r]eporting regularly as instructed." 37 Pa.Code § 63.4(3)(i). The Superior Court, in *Perez*, considered whether the registration requirements of [SORNA] were akin to probation or parole. *Perez*, 97 A.3d at 753–54. The Superior Court concluded that the requirements were not analogous because a registrant under Megan's Law IV must report changes to registration information but, unlike a probationer or parolee, is not required to seek permission to, for instance, change jobs or move. *Id.* at 754 (citing *Smith*, 538 U.S. at 101–02, 123 S.Ct. 1140).
>
> In a concurring opinion, Judge Donohue stated that it was important that, under the quarterly verification requirement, a registrant must not only verify his information, but must do so in

person. *Id.* at 752 (Donohue, J., concurring). Reasoning that this requirement "greatly resembles the periodic meetings with probation officers imposed on probationers," Judge Donohue would have held that due to the in-person reporting requirements of Section 9799.15(e)(3) and (g), along with the plethora of information required by Section 9799.16(b), these provisions of Megan's Law IV do, in fact, closely resemble the supervision afforded individuals on probation or parole:

Like the conditions imposed on probationers, registrants under [[SORNA]] must notify the state police of a change in residency or employment.... Offenders also face incarceration for any non-compliance with the registration requirements.... Furthermore, [[SORNA]] requires registrants who do not have a fixed work place to provide "general travel routes and general areas where the individual works" in order to be in compliance.... The Supreme Court in *Smith* stated that "[a] sex offender who fails to comply with the reporting requirement may be subjected to criminal prosecution for that failure, but any prosecution is a proceeding separate from the individual's original offense." *Smith*, 538 U.S. at 101–02, 123 S.Ct. 1140. However, violations for noncompliance with both probation and [[SORNA]] registration requirements are procedurally parallel. Both require factual findings to determine whether a violation has actually occurred.... Similarly, but for the original underlying offense, neither would be subject to the mandatory conditions from which the potential violation stems.

*Id.* at 764 (internal citations omitted). We find this rationale convincing and determine that this second factor weighs in favor of a finding that the quarterly verification provision is punitive.

*Coppolino v. Noonan*, 102 A.3d 1254, 1270-71 (Pa. Cmwlth. 2014) *aff'd*,

125 A.3d 1196 (Pa. 2015).

Although not binding upon us, we agree with the *Coppolino* Court's

analysis that the analogy to probation is stronger with regard to the

quarterly, in-person reporting requirements at issue here as compared to

those at issue in **Smith**.  Thus, we conclude that the second **Mendoza–Martinez** factor weighs in favor of finding SORNA's effects to be punitive, with one caveat.  Probation is quite unlike incarceration in that it involves a significantly lesser burden on an individual's liberty.  As our Supreme Court has recognized: "Probation, like parole, is not part of the criminal prosecution, and thus the full panoply of rights due a defendant in a criminal trial does not apply to probation revocation.  Probation is a suspended sentence of incarceration served upon such terms and conditions as imposed by the sentencing court."  **Commonwealth v. Holder**, 805 A.2d 499, 503 (Pa. 2002) (internal citation omitted).  While probation is now ubiquitous as a manner of reprimanding criminals, it is also the least onerous and most recent entry in the category of 'traditional' punishments.[9]  Thus, while we

_____

[9] Probation was not known as a form of punishment when the ex post facto clauses of the Federal and Pennsylvania Constitutions were written.

> [T]he modern probation system is said to have begun in the United States in 1841, when a Boston boot maker named John Augustus offered to take charge of a drunk who had come before a police court.  **See** David C. Anderson, Sensible Justice, Alternatives to Prison 4 (1998).  Augustus returned the man to court three weeks later, sober and gainfully employed, at which time the judge fined him a penny plus costs and let him go.  **Id.** This pioneer began bailing out likely rehabilitative risks on a regular basis, and was soon joined by volunteers.  **Id.**  His community-service efforts were so successful that in 1878, the Massachusetts legislature formalized release under court supervision, and before long other states followed.  **Id.** Probation became the most widely imposed criminal sanction. **Id.**

*(Footnote Continued Next Page)*

conclude that this factor weighs in favor of finding SORNA's effects to be punitive, we assign this factor less weight than if the punitive measures at-issue were more akin to incarceration.

*3) whether it comes into play only on a finding of scienter*

Appellant concedes that the third **Mendoza–Martinez** factor does not weigh in favor of deeming the effects of SORNA to be punitive. Nevertheless, in **Smith**, the United States Supreme Court pronounced that this factor is entitled to little weight when evaluating Megan's Law registration and reporting requirements. **See Smith**, 538 U.S. at 105. Thus, we also conclude that the third **Mendoza–Martinez** factor weighs against finding SORNA's effects to be punitive, but assign that factor little weight.

*4) whether its operation will promote the traditional aims of punishment—*

*retribution and deterrence*

In **Smith**, the High Court stated: "Any number of governmental programs might deter crime without imposing punishment. To hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' ... would severely undermine the Government's ability to engage in effective

*(Footnote Continued)* ―――――――――

**United States v. K**, 160 F. Supp. 2d 421, 430 (E.D.N.Y. 2001).

regulation." **Smith**, 538 U.S. at 102 (internal citation and quotation marks omitted). In **Perez**, this Court noted:

> [T]here is much in this statute designed for deterrence, as well as some aspects of retribution given the new length of registration. However, taking into account the high risk of recidivism, the General Assembly is permitted to have some deterrent and retributive effects in its legislation as long as they are "consistent with ... regulatory objectives [and are] reasonably related to the danger of recidivism." **Id.** We conclude that the effects of this statute are so reasonably related.

**Perez**, 97 A.3d at 756.

Appellant argues, however, that the Majority in **Perez** "failed to consider the drastic overall change in SORNA when compared to previous versions of Megan's Law." Appellant's Brief, at 16 (citing Judge Donahue's reasoning in her concurrence in **Perez**, indicating that she would have ruled the fourth **Mendoza–Martinez** factor weighs in favor of finding SORNA's effects to be punitive). Appellant also cites this Court's decision in **Commonwealth v. Hainesworth**, 82 A.3d 444 (Pa. Super. 2014), where we acknowledged what might be considered both the deterrent and retributive effects of SORNA:

> "[R]egistration obviously has serious and restrictive consequences for the offender, including prosecution if the requirement is violated. Registration can also affect the offender's ability to earn a livelihood, his housing arrangements and options, and his reputation." **Commonwealth v. Gehris**, –––Pa. –––, 54 A.3d 862, 878 (2012) (Castille, C.J., Opinion in Support of Reversal). In fact, the requirements of registration are so rigorously enforced, even "[t]he occurrence of a natural disaster or other event requiring evacuation of residences shall

- 20 -

not relieve the sexual offender of the duty to register." 42 Pa.C.S. § 9799.25(e).

***Hainesworth***, 82 A.3d at 449.

Combining with his own the thoughts of Judge Donahue in ***Perez***, and Justice Castille in ***Gehris*** (as quoted by the ***Hainesworth*** Majority), Appellant argues that "because an individual may be affected dramatically by such consequences, he or she might find themselves under circumstances which make it impossible to comply with SORNA, yet they are barred from seeking relief from the courts until the circumstances may be rectified, because a duty has been placed upon the registrant which is not dissimilar to strict liability. Appellant's Brief, at 17 (citing 42 Pa.C.S. § 9799.23(b)(2) ("Except as provided in section 9799.17 (relating to termination of period of registration for juvenile offenders), the court shall have no authority to relieve a sexual offender from the duty to register under this subchapter or to modify the requirements of this subchapter as they relate to the sexual offender.")). Thus, Appellant contends that, "[f]aced with the major changes of lifetime registration, reporting on a quarterly basis, and the increase in the acquisition and dissemination of information, which is retributive in nature, this Court should conclude that [the fourth ***Mendoza–Martinez*** factor] weighs in favor of holding" SORNA's effects to be punitive. ***Id.***

We are not convinced by Appellant's attempts to distinguish this matter from ***Smith*** and ***Perez***. First, neither Judge Donahue's comments in ***Perez***, nor Justice Castille comments in ***Gehris***, appear within a majority

opinion. In any event, substantively speaking, Appellant's argument appears to be that because the consequences of violating the terms of SORNA are akin to strict liability, they promote the traditional aims of punishment—retribution and deterrence. However, strict liability, whether or not it has a deterrent or retributive effect in the criminal context, has traditionally been applied in civil law. Thus, putting aside the appropriateness of using strict liability principles in the context of criminal law, strict liability has not at all been historically considered a hallmark of criminal law or criminal punishment. Moreover, in both civil and criminal contexts, strict liability speaks to what constitutes a violation of the law, and not to what the appropriate punishment should be for that violation. Thus, we conclude that the fourth **Mendoza–Martinez** factor weighs against finding SORNA's effects to be punitive.

*5) whether the behavior to which it applies is already a crime*

It is beyond obvious that the behavior to which SORNA applies is a crime: the statute is triggered by a criminal conviction. However, in **Smith**, the United States Supreme Court assigned the fifth **Mendoza–Martinez** factor little weight because ASORA's regulations applied "only to past conduct, which was, and is, a crime." **Smith**, 538 U.S. at 105. SORNA is no different in this regard.

Appellant invokes Justice Souter's concurrence in **Smith** to argue otherwise. **See Smith**, 538 U.S. at 109 (Souter, J., Concurring) (noting that ASORA "serves to feed suspicion that something more than regulation of safety is going on" because "there is room for serious argument that the alternative purpose is to revisit past crimes, not prevent future ones"). However, we are constrained by the Majority in **Smith** to conclude this factor is to be afforded little weight, and Appellant fails to distinguish the instant matter other than by simply relying on the non-binding comments of Justice Souter. Accordingly, while the fifth **Mendoza–Martinez** factor clearly weighs in favor of finding SORNA's effects to be punitive, it cannot bear significant weight in our analysis.

*6) whether the alternative purpose to which it may rationally be connected is assignable for it*

The sixth **Mendoza–Martinez** factor was assigned significant weight in the **Smith** Court's analysis of ASORA's punitive effects. In **Perez**, the appellant had conceded in his brief that the statute "is rationally connected to the Commonwealth's compelling interest in seeking to prevent crimes of a sexual nature, particularly those committed against children." **Perez**, 97 A.3d at 757. Instantly, Appellant only makes a qualified or partial concession. **See** Appellant's Brief, at 18 ("Though [Appellant] does not disagree that the enactment of SORNA is connected to a compelling state

interest of seeking to prevent sexual crimes, [Appellant] does not concede that the connection is rational.").

Essentially, Appellant argues that SORNA's restrictions are not rationally related to its non-punitive purpose(s). For instance, Appellant points to the fact that he is now placed "in the same Tier as those convicted of kidnapping, rape, involuntary deviate sexual intercourse[,] and aggravated assault, and subject to the same reporting requirements as a[n] [SVP], with no real or empirical proof that he pose[s] the same threat or level of recidivism." Appellant's Brief, at 18. This is despite the fact that Appellant was not categorized as such under the previous version of Megan's Law, and despite the fact that "in the past 13 years, while reporting annually, he as not re-offended." *Id.*

Additionally, Appellant contends that his re-categorization into the top tier of offenders under SORNA undermines the purpose of publically disseminating information about sexual offenders to the public. He argues that his re-categorization was enacted "[w]ithout distinction of who may pose a real threat," and, consequently, "it is impossible for the public to know who the real threat is." *Id.* at 19.

Appellant's argument seems misplaced, as it appears more attuned to address the seventh *Mendoza–Martinez* factor, given that he is essentially arguing that SORNA's new categorizations are over-inclusive (*i.e.*, excessive) in relation to SORNA's ostensibly non-punitive purposes. That is not the same issue as whether there is a rational relationship between the non-

punitive purposes and the regulations imposed to serve those purposes. A rational relationship may exist whether the rules are over- or under-inclusive.

Indeed, as a practical matter, perfect precision is unrealistic. It may be the case that an individual sex offender, who appears most likely to reoffend, might never commit another offense even in the absence of any Megan's Law regime. Similarly, an individual registrant, who appears least likely to reoffend, might reoffend despite the most onerous Megan's Law sanctions. Simply put, it is impossible to predict future behavior with perfect accuracy; thus, no regime designed to prevent future behavior can be held to such exacting standards of rationality. It is enough that the statute will *sometimes* fulfill its non-punitive purpose to demonstrate the rationality of the measures imposed. As the **Smith** Court stated, "A statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." **Smith**, 538 U.S. at 103. Thus, we conclude that the sixth **Mendoza–Martinez** factor weighs against finding SORNA's effects to be punitive.

*7) whether it appears excessive in relation to the alternative purpose assigned*

Finally, and not surprisingly, Appellant "incorporates his argument set forth under the sixth factor" to argue that SORNA is excessive in relation to its non-punitive purposes. Appellant's Brief, at 20. He supports that

argument by drawing our attention to the fact that our Supreme Court in *Williams II* addressed an incarnation of Megan's Law that was generally less onerous than SORNA and, more specifically, the most onerous provisions in those prior statutes attached only to the most serious offenders, such as those determined to be SVPs.

In *Smith*, the United States Supreme Court advised that: "The excessiveness inquiry of our ex post facto jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Smith*, 538 U.S. at 105. Here, the relevant legislative objectives underlying Appellant's registration and reporting requirements are:

> (5) To provide a mechanism for members of the general public to obtain information about certain sexual offenders from a public Internet website and to include on that Internet website a feature which will allow a member of the public to enter a zip code or a geographic radius and determine whether a sexual offender resides within that zip code or radius.

> (6) To provide a mechanism for law enforcement entities within this Commonwealth to obtain information about certain sexual offenders and to allow law enforcement entities outside this Commonwealth, including those within the Federal Government, to obtain current information about certain sexual offenders.

42 Pa.C.S. § 9799.10.

In arguing that SORNA's lifetime registration and quarterly reporting requirements are excessive in light of these non-punitive purposes, Appellant points to the following passage from **Williams II**:

> [I]f the Act's imprecision is likely to result in individuals being deemed [SVPs] who in fact do not pose the type of risk to the community that the General Assembly sought to guard against, then the Act's provisions could be demonstrated to be excessive in relation to the remedial purposes served.

**Williams II**, 832 A.2d at 983.

Appellant interprets this passage from **Williams II** as suggesting that similar provisions, now applied to non-SVPs such as himself under SORNA, are excessive under the presumption that the restrictions placed on SVPs in **Williams II** were *only* justified in light of the greater threat presented by those individuals. However, Appellant misses a key distinction between his present argument and the issue being discussed in his quotation from **Williams II**. The above-quoted language concerned excessiveness in the SVP determination *process*, not a challenge to excessiveness of the *conditions* themselves. This is clear when one reads the above-quoted passage in the full context in which it was made. *After* concluding that the restrictions placed on SVPs were not excessive in their own right, the **Williams II** Court stated:

> Amicus Defender Association of Philadelphia … additionally maintains that the statute is impermissibly vague, in that it fails to allow for a sufficiently precise understanding of who is or is not a sexually violent predator. As [the a]ppellees' void for vagueness challenge was not addressed by the trial court, and the matter will be remanded for consideration of this claim, any imprecision in the Act's provisions must presently be evaluated

in terms of whether it renders the statute unconstitutionally punitive through excessiveness. Primarily, if the Act's imprecision is likely to result in individuals being deemed sexually violent predators who in fact do not pose the type of risk to the community that the General Assembly sought to guard against, then the Act's provisions could be demonstrated to be excessive in relation to the remedial purposes served. This could be accomplished in multiple ways. For example, [the a]ppellees could show that it is not sufficiently clear which predicate offenses are intended to lead to a sexually violent predator assessment in the first instance. Alternatively, [the a]ppellees could establish that the offender assessment process is so unreliable that there will be little correlation between those ultimately deemed sexually violent predators and the class of individuals who pose the greatest risk of predation.

*Id.*

However, before this passage, when discussing the excessiveness of the restrictions under Megan's Law II, the **Williams II** Court stated: "In general, and with due deference to the legislative findings and recognition of the present state of the record, measures requiring registration, notification, and counseling appear reasonably designed to serve the government's legitimate goal of enhancing public awareness and ensuring that offenders do not relapse into harmful behavior." **Williams II**, 832 A.2d at 981. With regard to the more severe restrictions placed upon SVPs, the **Williams II** Court concluded that "the duties imposed upon the [SVP] with regard to registration, verification, and counseling, *are not in themselves sufficiently onerous to qualify as punishment based upon alleged excessiveness*." **Id.** at 982 (emphasis added). Thus, the **Williams II** Court found that the most severe restraints under Megan's Law II, those placed on SVPs, were not onerous enough to qualify as punishment independent of the separate issue

of whether the process by which those greater restraints were imposed was over-inclusive.

Under SORNA, the Legislature has not sought to justify registration and reporting requirements for Tier III offenders, such as Appellant, based on criteria for determining who is or who is not an SVP. Instead, the Legislature has based Appellant's registration and reporting requirements solely on his conviction for a Tier III sexual offense. Thus, the language Appellant relies upon from **Williams II** does not support his argument.

Appellant does argue that his inclusion in Tier III under SORNA is "arbitrary" because his conviction was not subject to the most severe restriction under the prior version of Megan's Law. Appellant's Brief, at 20. However, it could just as easily be said that his particular offense's exclusion under the prior regime was itself arbitrary, and the new categorization has remedied that prior oversight. In any event, Appellant does not develop this argument sufficiently for us to consider it proof of excessiveness.

Appellant does not appear to be suggesting that SORNA cannot differentiate between minor and major sexual offenses for purposes of determining the severity of Megan's Law restrictions. Instead, he argues that his offense, indecent assault, should not be subject to the same restrictions set forth for other Tier III offenses. However, Appellant's Tier III offense, 18 Pa.C.S. § 3126(a)(7), is not a minor sexual offense in our view, and Appellant does not offer any argument to the contrary, other than to

present the bare assertion that his offense is substantially different from more serious sexual crimes, such as rape.

However, the offense of indecent assault encompasses a wide range of prohibited conduct. **See** 18 Pa.C.S. § 3126(a)(1)-(8). Indecent assault can be graded as low as a second-degree misdemeanor, or as high as a felony of the third degree. **See** 18 Pa.C.S. § 3126(b). Appellant's offense was graded as a first-degree misdemeanor. Thus, although his offense did not receive the most severe grading for indecent assault, it was not the least severe grading, either. Indeed, Appellant was convicted of the only form of indecent assault that *could* be graded as a felony, 18 Pa.C.S. § 3126(a)(7), which occurs when an indecent assault is committed against a minor under the age of 13. **See** 18 Pa.C.S. § 3126(b)(3). Clearly, even prior to SORNA, the legislature determined that an indecent assault committed under Section 3126(a)(7) is the most severe form of indecent assault. That Appellant was not subject to the harshest possible grading of that offense does not alter this reality.

Moreover, Appellant was convicted of committing an indecent assault against a mentally challenged 12-year-old. **See** N.T., 1/31/03, at 12. As such, Appellant's attempt to downplay the severity of his offense by contending that "indecent assault is arbitrarily included within Tier III with such crimes as rape, involuntary deviate sexual intercourse[,] and aggravated indecent assault" rings hollow. Only Section 3126(a)(7)-based indecent assaults are now included in Tier III. **See** 42 Pa.C.S. §

9799.14(d)(8). Nevertheless, Appellant is still not subject to the more severe restrictions imposed on individuals deemed to be SVPs, despite his implicit suggestion that he is being treated as such under SORNA. ***See*** 42 Pa.C.S. § 9799.36(a) (requiring, *inter alia*, SVPs "to attend at least monthly counseling sessions" which must be paid for by the SVP, and mandating monitoring by the State Sexual Offenders Assessment Board); 42 Pa.C.S § 9799.27 (enumerating, *inter alia*, additional public notification procedures applicable exclusively to SVPs (and sexually violent delinquent children), such as direct notification to the SVP's neighbors and nearby schools, day-care centers, colleges, and universities); 42 Pa.C.S § 9799.28 (requiring, *inter alia*, additional information to be displayed on the Megan's Law website for SVPs; including information regarding where a transient SVP "eats, frequents[,] and engages in leisure activities").

For these reasons, we conclude, at least as applied to Appellant, the lifetime registration and quarterly, in-person reporting requirements at issue are not excessive in light of SORNA's non-punitive legislative purposes.

*Balancing of factors*

In sum, we conclude that the first, second, and fifth ***Mendoza– Martinez*** factors weigh in favor of finding SORNA's effects to be punitive. However, we assign diminished weight to the second factor because SORNA's effects are more akin to probation than to incarceration, and, in accordance with ***Smith***, we assign minimal value to the fifth factor. By

contrast, we conclude that the third, fourth, sixth, and seventh **Mendoza–Martinez** factors all weigh against finding SORNA's effects to be punitive. We also follow **Smith**'s direction that the sixth factor is of significant weight, and that the third factor is not.

Given that the balance of these factors weighs against finding SORNA's effects to be punitive, we are constrained to conclude that Appellant has not demonstrated by the "clearest proof" that SORNA's effects are punitive, despite the Legislature's non-punitive intent. **Lehman**, 839 A.2d at 272. Accordingly, we hold that SORNA's retroactive imposition of lifetime registration and quarterly, in-person reporting requirements on Appellant does not violate the ex post facto clauses of the United States and Pennsylvania Constitutions.

Order **affirmed**.

Judge Shogan joins this opinion.

Judge Platt concurs in the result of this opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/23/2016